## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **TINA LANGFORD and STEVEN LANGFORD,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ELUTIA INC. f/k/a AZIYO BIOLOGICS, INC., DCI DONOR SERVICES, INC., and NEW MEXICO DONOR SERVICES**<br><br>**Defendants.** | **Case No.:**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs, Tina Langford and Steven Langford, husband and wife, by and through their attorneys, and for their complaint against Defendants, Elutia Inc. f/k/a Aziyo Biologics, Inc. (hereinafter Elutia Inc. is referenced as "Aziyo"), DCI Donor Services, Inc., and New Mexico Donor Services (hereinafter DCI Donor Services, Inc. and New Mexico Donor Services are referenced together as "Donor Services") allege as follows:

## I.   INTRODUCTION

1.      This action seeks to recover damages for the personal injuries suffered by Plaintiff Tina Langford as the direct and proximate result of the wrongful conduct of Defendants in connection with the research, testing, design, development, manufacture, tissue recovery, production, inspection, labeling, advertisement,

1

marketing, promotion, sale, and distribution of a product known as FiberCel Fiber Viable Bone Matrix ("FiberCel") and the human tissue used to make FiberCel. Defendants' negligence resulted in personal injury suffered by the Plaintiff, Tina Langford, after the FiberCel product was used in her surgical procedure. Her spouse, Steven Langford, brings a claim for loss of consortium.

## II.   <u>PARTIES</u>

2.      Plaintiffs Tina Langford ("Plaintiff") and Steven Langford ("Plaintiff-spouse") have been and are residents of the State of Georgia, residing in Calhoun, Georgia.

3.      Defendant Elutia Inc. f/k/a Aziyo Biologics, Inc., is a Delaware corporation, whose registered agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Aziyo's principal place of business is located at 12510 Prosperity Drive, Suite 370, Silver Spring, Maryland 20904. Aziyo does business throughout the United States, including conducting regular business in Georgia.

4.      Aziyo sells a variety of medical products, including implantable electronic devices, orthopedic and spinal repair products, and soft tissue reconstruction products.

5.      Upon information and belief, Aziyo developed, manufactured, marketed, promoted, distributed, and supplied the FiberCel product which was

implanted into Plaintiff and caused her personal injury.

6.     Defendant DCI Donor Services, Inc. is incorporated in Tennessee, having its principal place of business at 566 Mainstream Drive, Suite 300, Nashville, TN 37228-1234, with a registered agent for service located at Corporation Service Company, 2908 Poston Ave, Nashville, TN 37203-1312.  DCI Donor Services, Inc. is the parent company of New Mexico Donor Services.  DCI Donor Services, Inc. does business throughout the United States, including conducting regular business in Georgia.

7.     Defendant New Mexico Donor Services is a subsidiary of DCI Donor Services, Inc. and has its principal place of business at 1609 University Boulevard NE, Albuquerque, NM 87102, with a registered agent for service located at Corporation Service Company, 110 E. Broadway St., Hobbes, NM 88240.  New Mexico Donor Services does business throughout the United States, including conducting regular business in Georgia.

8.     DCI Donor Services, Inc. and New Mexico Donor Services (collectively, "Donor Services") are engaged in the business of, inter alia, locating, properly identifying and qualifying, and recovering parts of human cadavers that should at all times qualify for recovery, processing, distribution, and ultimately for use in a wide variety of surgical procedures where human bone, tissue, etcetera, can be appropriately and safely utilized.

9.    Upon information and belief, Donor Services harvested, recovered, processed, supplied, and/or sold human tissue for use in FiberCel which was implanted into Plaintiff, and which is the subject of this complaint.

10.    Defendants, at all times relevant to this lawsuit, manufactured, developed, designed, marketed, distributed, promoted, supplied, provided human tissue for, and/or otherwise sold (directly or indirectly) FiberCel to various locations for use in surgeries requiring bone grafting, including to Floyd Medical Center in Rome, Georgia where tuberculosis-contaminated FiberCel was surgically implanted into Plaintiff Tina Langford, causing her to suffer harm as described herein.

11.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

12.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

### III.    JURISDICTION AND VENUE

13.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is diversity of citizenship.

14.    The parties have all had substantial contacts with the State of Georgia and otherwise meet the criteria for personal jurisdiction.

15.    At all times relevant to this action, the Defendants have been engaged, either directly or indirectly, in the business of manufacturing, marketing, selling, promoting, and/or distributing FiberCel and/or the human tissue used in FiberCel to various locations for use in surgeries requiring bone grafting within the State of Georgia, with a reasonable expectation that the product would be used in this state, and have regularly solicited or transacted business in this State, thereby subjecting the Defendants to personal jurisdiction.

16.    Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 84(c)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Gordon County, Georgia.

### IV.    FACTUAL ALLEGATIONS

#### A.    FiberCel Fiber Viable Bone Matrix

17.    The FiberCel Fiber Viable Bone Matrix product is made from processed human tissue consisting of cancellous bone particles with preserved living

cells, combined with demineralized cortical fiber.  FiberCel is used as a bone void filler in various orthopedic and spinal procedures. The allografts contain the scaffold, growth factors, and cells required for regeneration critical for successful bone formation.

18.    FiberCel is classified by the FDA as a human cell, tissue, cellular or tissue-based product (HCT/P).

19.    Aziyo classifies its FiberCel product as a "VBM [Viable Bone Matrix]."[1]

20.    FiberCel is a human tissue based medical product that was developed by Aziyo.

21.    FiberCel is marketed for use in orthopedic and reconstructive bone grafting procedures with the use of autologous bone or other forms of allograft bone or alone as a bone graft.

22.    The FiberCel package insert states that "THIS PRODUCT IS MANUFACTURED FROM DONATED HUMAN TISSUE," which consists of highly processed donor tissue and growth factor cells. The exact formulation of FiberCel is closely held by Defendants and is not known to Plaintiffs.

23.    The FiberCel package insert also contains a Warnings and Precautions

_____

[1] *See* Elutia Website,  https://elutia.com/products/orthopedic-spine/fiber-viable-bone-matrix/ (last accessed on August 28, 2024).

6

section that states "FiberCel is preserved in 5% dimethyl sulfoxide (DMSO) in a 0.9% sodium chloride solution. Povidone iodine, Dulbecco's phosphate buffered saline, sodium phosphate, hydrochloric acid and hydrogen peroxide are all used for processing, preservation and storage of the allografts and trace amounts of these solutions may be present in the product."

24.    The package insert indicates that "FiberCel should be transplanted within two hours of thawing and all unused product should be discarded. Product is intended for single use and should not be refrozen or sterilized."

25.    The FiberCel package insert also contains a Warnings and Precautions section that states: "FiberCel is preserved in 5% dimethyl sulfoxide (DMSO) in a 0.9% sodium chloride solution. Povidone iodine, Dulbecco's phosphate buffered saline, sodium phosphate, hydrochloric acid and hydrogen peroxide are all used for processing, preservation and storage of the allografts and trace amounts of these solutions may be present in the product."

26.    The package insert indicates that "FiberCel should be transplanted within two hours of thawing and all unused product should be discarded. Product is intended for single use and should not be refrozen or sterilized."

27.    Because FiberCel uses human tissue from human donors and includes preserved living cells, it is imperative that rigorous screening and quality control procedures be used to ensure that the resultant product is not contaminated.  This is

also so because the FiberCel product is meant to be used in surgeries and medical procedures involving patients already in a vulnerable medical status given their context as procedure recipients.

28.   The FiberCel used in Plaintiff's surgery was manufactured using contaminated human tissue recovered from a single donor by Donor Services.

29.   Upon information and belief, the single donor whose tissue was recovered by Donor Services had a tuberculosis infection prior to death. Moreover, at the time of death, this same donor had clear signs and symptoms of an infectious etiology.

30.   On June 28, 2024, Aziyo received a warning letter from the FDA[2] related to its VBM products.

31.   In this June 2024 Warning Letter, the FDA determined that the processing of Aziyo's VBM products "alters the original relevant characteristics of cartilage[.]"[3]

32.   Moreover, the FDA determined that "the manufacture of [Aziyo's VBMs] involve[s] the combination of the cells or tissues with another article, [that

_____

[2] *See* Karlton Watson, *Warning Letter: Berkeley Biologics, LLC, previously operating as Elutia, Inc. – Orthobiologics Business Unit, formerly Aziyo Biologics, Inc.*, U.S. FOOD AND DRUG ADMINISTRATION (June 28,2024), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/berkeley-biologics-llc-previously-operating-elutia-inc-orthobiologics-business-unit-formerly-aziyo.
[3] *Id.*

isn't] water, crystalloids, or a sterilizing, preserving, or storage agent."[4]

33.    The FDA concluded that Aziyo's VBM products cannot be regulated solely as human tissue products due to manipulation of the human tissue and the addition of "another article".

34.    The FDA concluded that Aziyo's VBM products had to be regulated as drugs.

35.    In the same warning letter, the FDA concluded that it did not have enough information to reach a conclusion as to whether Aziyo's FVBM products could also continue to be regulated solely as human tissue products (HCT/Ps) or whether they needed to be regulated as drugs like Aziyo's VBM products.

**B.    The FiberCel Product is Recalled.**

36.    On June 2, 2021, the United States Food & Drug Administration ("FDA") issued an urgent voluntary recall of FiberCel, specifically three products from Donor Lot Number NMDS210011: VBM9901, VBM9905, and VBM9910.

37.    Aziyo initiated the voluntary recall in response to reports of patients testing positive for Tuberculosis and post-surgical infections following the surgical implantation of FiberCel as part of an orthopedic or spinal procedure.

38.    Tuberculosis ("TB") is an infectious disease caused by bacteria known as Mycobacterium tuberculosis.  TB is highly contagious and mostly impacts the

---

[4] *Id*.

lungs, but can also spread through the lymph nodes to other parts of the body including the kidneys, brain, and spine.

39.     Once Mycobacterium tuberculosis is introduced to the body, the bacteria must then proliferate within the new host for the host to develop disease. When this bacterium is introduced in a surgical wound, the patient is already in an immunocompromised position, causing them to have an increased likelihood of developing TB, which can be fatal.

40.     The recalled contaminated FiberCel units were delivered to at least 20 states, including Georgia.

41.     Dozens of patients that have received FiberCel from this Donor Lot have tested positive for TB, including Plaintiff.

42.     In a press release dated June 7, 2021, Aziyo acknowledged:

[L]earning of post-surgical infections in patients treated with FiberCel, including some patients that tested positive for tuberculosis. The lot consists of 154 units of FiberCel, all derived from a single donor, that were shipped to facilities in 20 states. Aziyo is investigating the source of the infections in coordination with its distributor, the U.S. Food and Drug Administration and the U.S. Centers for Disease Control and Prevention. The Company is in the process of recovering the unused units from this lot….

43.     The product recall acknowledged that viruses and bacteria, including TB, can be transplanted into patients along with the FiberCel product.

**C.     Plaintiff Received the Contaminated FiberCel Product and Suffered Severe Injury.**

44.     Plaintiff Tina Langford underwent spinal surgery on April 14, 2021, at Floyd Medical Center in Rome, Georgia.

45.     The surgery was performed by Dr. John Cowan, M.D., a neurosurgeon certified by the American Board of Neurological Surgery.

46.     During Plaintiff's surgery, Dr. Cowan implanted the FiberCel product, Lot Number NMDS210011, into Plaintiff's body.

47.     The FiberCel product contained no adequate warning to Dr. Cowan or to Plaintiff of the danger that she could contract TB if a FiberCel product was used during the surgery.

48.     Unbeknownst to Plaintiff or her physicians at the time of her surgery, the FiberCel implanted into Plaintiff was contaminated with TB.

49.     While the surgery was initially a success, Plaintiff soon began experiencing problems.

50.     On June 8, 2021, Plaintiff received a call from Gordon County Health Department stating that Floyd Medical Center had notified them that the FiberCel that Dr. Cowan had used in her surgery was tainted with tuberculosis. Plaintiff subsequently tested positive for TB.

51.     Plaintiff's TB was caused by the contaminated and recalled FiberCel used in her operation, which contained contaminated human tissue recovered by

Donor Services and which was developed, manufactured, and sold by Aziyo.

52.    As a direct and proximate result of the implantation of contaminated FiberCel, Plaintiff was and is forced to undergo a grueling medical protocol to manage her TB diagnosis.

53.    Plaintiff will require continued medical monitoring now and into the future in order to monitor Plaintiff's health related to the ongoing and serious nature of her TB diagnosis.

54.    Plaintiff would not have suffered from TB had Defendants sold and distributed a product and recovered human tissue that was free from TB contamination.

55.    Plaintiff further has experienced significant side effects from the TB and the extensive TB treatments causing a cascade of sequential complications and injuries caused by the contaminated FiberCel product.

56.    As a direct and proximate result of Plaintiff's exposure to Defendants' contaminated FiberCel product and human tissue recovered for use in FiberCel, which was used in her spinal surgery, Plaintiff has suffered and continues to suffer from pain and discomfort, severe emotional distress, the loss of daily functions, and economic loss, including, but not limited to, present and future medical expenses, all as a direct result of Defendants' liability producing conduct.

## V.     PUNITIVE DAMAGES ALLEGATIONS

57.     Plaintiff is further informed and believes that Defendants' misconduct, as previously outlined herein, constituted a conscious disregard for the rights and safety of other persons, including Plaintiff Tina Langford, that had a great probability of causing substantial harm including, but not limited to, exposing her and other recipients of FiberCel to tuberculosis, a potentially deadly infectious disease.

58.     Plaintiff is further informed and believes that Defendants engaged in conduct with respect to the contaminated FiberCel unit alleged herein which was a legal cause of loss, damages, injuries, and harm to Plaintiff, and which exposed Plaintiff and other recipients of the contaminated FiberCel units to serious complications, including the diagnosis of tuberculosis in Plaintiff's post-surgical wound.

59.     Defendants' actions and inactions leading to the contamination of the FiberCel product were outrageous, willful and wanton, and done with reckless disregard for the safety of the Plaintiff.

60.     The Defendants' outrageous, willful and wanton, and reckless conduct in disregard of the safety of the Plaintiff was the direct proximate cause of Plaintiff's injuries and damages.

61.     Defendants thereby acted with a conscious disregard for the rights and safety of Plaintiff Tina Langford and other users of the contaminated FiberCel units, thus warranting an award of punitive damages to Plaintiff.

## VI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)

62.     Plaintiffs incorporate the foregoing paragraphs 1 through 61 as though the same were set forth at length herein.

63.     Aziyo owed a duty to Plaintiff Tina Langford to exercise reasonable care in designing, developing, researching, manufacturing, marketing, supplying, promoting, selling, testing, quality assurance, quality control, and distribution of FiberCel into the stream of commerce, including a duty to assure that the FiberCel would not cause those who used it, including Plaintiff, to suffer adverse harmful effects.

64.     Aziyo failed to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and distribution of FiberCel.

65.     Aziyo knew or should have known that those individuals who used the defective FiberCel were at risk for suffering harmful effects from it, including but not limited to, TB, as well as other severe injuries which are permanent and lasting

in nature, physical pain, mental anguish, and diminished enjoyment of life.

66.     Aziyo was negligent in designing, developing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and sale of FiberCel.  The negligence of Aziyo, its agents, servants, and employees, included, but was not limited to, the following acts and/or omissions:

   a.  Designing, developing, manufacturing, producing, creating, and/or promoting FiberCel without adequately, sufficiently, or thoroughly testing the FiberCel units to ensure they were free from contamination of communicable diseases, including but not limited to, TB;

   b.  Negligently selling their FiberCel product which was contaminated with TB;

   c.  Not conducting a sufficient quality control testing program to determine whether or not the subject FiberCel was manufactured properly and was free from contamination or other defects making it unsafe for users of the product;

   d.  Failing to have a sufficient quality control program to ensure that the donor whose tissue was used in the subject FiberCel was free from communicable disease;

   e.  Failing to adequately and properly obtain and review complete donor medical history of the donor whose tissue was used in the product;

   f.  Failing to adequately and properly review the entire donor chart for signs and symptoms of communicable disease;

   g.  Failing to recognize signs and symptoms of communicable disease in the donor whose tissue was used in the recalled FiberCel;

   h.  Negligently making a donor eligibility determination;

15

    i.  Failing to follow applicable statutes, regulations, FDA guidelines, AATB rules, and industry standards in determining that donor tissue used in the recalled FiberCel was eligible for use in the product;

    j.  Negligently failing to timely recall their dangerous and defective FiberCel lots at the earliest date that it became known that certain lots of FiberCel were, in fact, dangerous and defective;

    k.  Negligently manufacturing FiberCel in a manner that was dangerous to those individuals who had FiberCel implanted into their bodies;

    l.  Negligently producing FiberCel in a manner that was dangerous to those individuals who had it transplanted into their bodies;

    m. Negligently and carelessly using human tissue from an unqualified and inadequately screened human donor;

    n.  Were grossly negligent by willfully ignoring factors that should have led the donor to be deemed ineligible for tissue recovery;

    o.  Failing to warn individuals who were using the product of the risks of contracting tuberculosis;

    p.  Acting otherwise careless and negligently; and

    q.  Were otherwise negligent as shall be shown through discovery and at trial.

67.    Aziyo knew or should have known that consumers such as Plaintiff would suffer foreseeable injury and be at increased risk of suffering an injury as a result of its failure to exercise ordinary care, as set forth above.

68.    Aziyo's negligence was the proximate cause of and was a substantial factor in causing Plaintiff's physical, mental, emotional injuries and harm, and economic loss.

69.     By reason of the foregoing, Aziyo is liable to Plaintiff for all of her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE**
**(Against DCI Donor Services, Inc. and New Mexico Donor Services)**

70.     Plaintiffs incorporate paragraphs 1 through 69 as though the same were set forth at length herein.

71.     Donor Services owed a duty to Plaintiff to exercise reasonable care in harvesting, recovering, processing, supplying, promoting, selling, testing, quality assurance, quality control, and distribution of human tissue into the stream of commerce, including a duty to assure that their human tissue, which was used in the subject FiberCel lot, would not cause those who used it, including Plaintiff, to suffer adverse harmful effects.

72.     Donor Services failed to exercise reasonable care in the harvesting, recovering, processing, supplying, testing, quality assurance, quality control, sale, and distribution of their human tissue for use in FiberCel.

73.     Donor Services knew or should have known that those individuals who were exposed to their contaminated human tissue used in FiberCel were at risk for suffering harmful effects from it, including but not limited to, tuberculosis, as well as other severe injuries which are permanent and lasting in nature, physical pain,

17

mental anguish, and diminished enjoyment of life.

74.     Donor Services was negligent in the harvesting, recovering, processing, supplying, testing, quality assurance, quality control, sale, and distribution of their human tissue for use in FiberCel.  The negligence of Defendants Donor Services, their agents, servants, and employees, included, but was not limited to, the following acts and/or omissions:

a. Harvesting, recovering, processing, and selling human tissue for use in FiberCel without adequately, sufficiently, or thoroughly testing the human tissue to ensure that it was free from contamination of communicable diseases, including but not limited to, TB;

b. Not conducting a sufficient quality control testing program to determine whether or not the subject human tissue used in the aforementioned defective FiberCel lot was properly recovered and was free from contamination or other defects making it unsafe;

c. Failing to adequately and properly obtain and review complete donor medical history;

d. Failing to stop the tissue recovery process once signs and symptoms of infection were discovered;

e. Failing to have medical professionals review the subject donor's body, medical records, and donor chart;

f. Negligently failing to timely recall their dangerous and contaminated human tissue at the earliest date that it became known that its human tissue sold for use in FiberCel was in fact, dangerous and defective;

g. Negligently harvesting, recovering, and selling human tissue for use in FiberCel in a manner that was dangerous to those individuals who had FiberCel implanted into their bodies;

h. Negligently and carelessly recovering tissue from an unqualified and inadequately screened human donor;

i. Negligently failing to screen the human donor whose tissue was used in the subject lot of FiberCel for signs of infection or disease that would have led Defendants to stop the tissue recovery process;

j. Negligently failing to test the human donor tissue and/or bone;

k. Failing to warn individuals who were using their human tissue of the risks of contracting TB;

l. Were grossly negligent by willfully ignoring factors that should have led the donor to be deemed ineligible for tissue recovery;

m. Acting in bad faith by failing to recognize obvious signs and symptoms of communicable disease of the donor and instead selling contaminated human tissue from the donor to be used in products that would be implanted into living individuals; and

n. Acting otherwise careless and negligently as shall be shown through discovery and at trial.

75. Donor Services knew or should have known that consumers, such as Plaintiff, would suffer foreseeable injury and be at increased risk of suffering an injury as a result of Donor Services' failure to exercise ordinary care, as set forth above.

76. Donor Services' negligence was the proximate cause of and was a substantial factor in causing Plaintiff's physical, mental, emotional, and economic injuries.

77. By reason of the foregoing, Donor Services are liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount

to be determined in the future in excess of $75,000.

### THIRD CAUSE OF ACTION
### NEGLIGENT FAILURE TO WARN
#### (Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)

78.     Plaintiffs incorporate the foregoing paragraphs 1 through 77 as though the same were set forth at length herein.

79.     At all relevant times, Defendant Aziyo designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the defective FiberCel product used in Plaintiff's spinal surgery.

80.     Aziyo knew or, by the exercise of reasonable care, should have known that the defective FiberCel product was contaminated, defective, harmful, and injurious when used as intended and when Plaintiff and Plaintiff's medical providers agreed to use the FiberCel product in a reasonably foreseeable manner.

81.     The Defendant knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the FiberCel product.

82.     The Defendant knew or, by the exercise of reasonable care, should have known, that the defective FiberCel product posed risks of harmful effects, including but not limited to the transmission of TB, or other viruses and bacteria, along with the FiberCel product after implantation.

83.    The Defendant owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of the FiberCel product.

84.    The Defendant breached their duty of care by failing to use reasonable care in providing adequate warnings to Plaintiff and Plaintiff's medical providers, through the FiberCel product's labeling and packaging, and through marketing, promoting, and advertising of the FiberCel product.

85.    At all relevant times, Defendant Aziyo could have provided adequate warnings and instructions to prevent such harmful effects, including but not limited to the transmission of TB, such as providing full and accurate information about the FiberCel product to physicians, to patients, in advertising, at point of sale, on the product's instructions and inserts, and on the product's labels.

86.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

87.    Plaintiff was injured as a direct and proximate result of Defendant's failure to warn and instruct because she would not have used, or agreed to use, the FiberCel product in her spinal surgery had she and her medical providers received adequate warnings and instructions that Plaintiff could be exposed to harmful effects, including but not limited to the transmission TB, upon implantation of the FiberCel product.

88.    Defendant's lack of adequate and sufficient warnings and instructions

and its inadequate and misleading advertising, labeling, and instructions to physicians and hospitals was a substantial contributing factor in causing the harm to Plaintiff.

89.    As a direct and proximate result of the actions and inactions of Aziyo as set forth above, Plaintiff was exposed to FiberCel and the contaminated human tissue used in FiberCel, and suffered the injuries and damages set forth herein.

90.    By reason of the foregoing, Defendant Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

**FOURTH CAUSE OF ACTION**
**NEGLIGENT MANUFACTURING**
**(Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)**

91.    Plaintiff incorporates paragraphs 1 through 90 as though the same were set forth at length herein.

92.    At all relevant times, Aziyo designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the defective FiberCel product used in Plaintiff's spinal surgery.

93.    Aziyo had a duty to use exercise reasonable care in the manufacturing, assembling, inspecting, testing, and packaging of the subject FiberCel

94.    Aziyo knew or, by the exercise of reasonable care, should have known,

use of the defective FiberCel product, carelessly manufactured, assembled, inspected, tested, and packaged was contaminated, defective, harmful and injurious when used by Plaintiff and Plaintiff's medical providers in a reasonably foreseeable manner.

95.     Aziyo knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the FiberCel device improperly manufactured assembled, inspected, and packaged.

96.     Without limitation, Aziyo breached its duty to exercise reasonable care in manufacturing, assembling, inspecting, and packaging the defective FiberCel product by their:

- Failure to follow Good Manufacturing Practices ("GMPs");

- Failure to adequately inspect/test the defective FiberCel product during the manufacturing process;

- Failure to adequately determine/test the integrity of the recovered human tissue used in the FiberCel product and its qualities.

97.     A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality and safety of their products.

23

98.    Plaintiff was injured as a direct and proximate result of Aziyo's failure to use reasonable care in the manufacturing, assembling, inspecting, and packaging of the defective FiberCel product as described herein.

99.    By reason of the foregoing, Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(Against Elutia Inc. f/k/a Aziyo Biologics, Inc)**

100.    Plaintiff incorporates paragraphs 1 through 99 as though the same were set forth at length herein.

101.    Aziyo had a duty to exercise reasonable care to those whom they provided information to about the defective FiberCel product and to all those relying on the information provided, including Plaintiff, her healthcare providers, and the public in general that the product had been tested and found to be safe and effective for use as bone void filler in various orthopedic and spinal procedures.

102.    Aziyo, in the course of selling the FiberCel product, supplied information about the devices through advertisements, marketing campaigns, sales representatives, labeling, and warnings.

103.    Defendant breached its duty by misrepresenting the defective FiberCel product's safety to the medical and healthcare community, to the Plaintiff, her

medical providers, and the public in general.

104.    Defendant's representations were made without properly conducting sufficient testing, donor screening, and quality control, and by providing insufficient warnings about the FiberCel product's potential harmful risks.

105.    Aziyo's false representations that the FiberCel product was safe for consumers and their failure to disclose existing facts of the FiberCel product's risk of transmitting viruses and bacteria, including TB upon implantation, were made or omitted with the intent to induce Plaintiff and Plaintiff's physicians to rely upon those facts or omissions.

106.    Since the TB bacteria must proliferate within the new host for the host to develop the disease, Plaintiff could not have known that the defective FiberCel product was unsafe to be used as a bone void filler in various orthopedic and spinal procedures due to the significantly increased risk of viruses and bacteria, including TB, being transmitted upon implantation, until after the defective FiberCel product was already implanted.

107.    Plaintiff justifiably relied upon the false representations of Defendant Aziyo.

108.    Had Defendant provided adequate warnings of the risk of viruses and bacteria, including TB, being transmitted along with implantation of the FiberCel product, such warnings would have been heeded and no healthcare professional,

including Plaintiff's physician, would have purchased and used the defective FiberCel product in spinal surgeries, and no patient, including Plaintiff, would have used, or agreed to use, the defective FiberCel product in their spinal surgery.

109.  As a direct and proximate result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects, including TB, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

110.  By reason of the foregoing, Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

**SIXTH CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT**
**(Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)**

111.  Plaintiff incorporates paragraphs 1 through 110 as though the same were set forth at length herein.

112.  At all times herein mentioned, Defendant Aziyo designed, manufactured, tested, marketed, sold, and distributed into the stream of commerce the aforementioned FiberCel, which was defective and unreasonably dangerous.

113.  In June 2021, Defendants recalled FiberCel from Donor Lot Number NMDS210011, which was contaminated with TB.

114.   The recalled lot of FiberCel deviated, in terms of construction, makeup, and quality, from the specifications or planned output in a manner that made it unreasonably dangerous.

115.   Defendant's quality control should have, but failed to, discover that the aforementioned FiberCel Donor lot was contaminated with tuberculosis.

116.   At all times herein mentioned, the aforementioned FiberCel was defective in its manufacture in that the FiberCel units were contaminated with TB, which in turn transplanted the serious and potentially deadly illness to patients, including Plaintiff, who was implanted with the contaminated FiberCel.

117.   The FiberCel unit manufactured by Aziyo and implanted into Plaintiff was unsafe, defective, and unreasonably dangerous before it left Aziyo's possession, and was in the same condition when implanted into Plaintiff as when placed into the stream of commerce by Aziyo.

118.   Aziyo  knew or should have known, based on the industry and scientific knowledge available at the time of their manufacture and distribution, that FiberCel contaminated with TB was defective, unsafe, and unreasonably dangerous to FiberCel users, including Plaintiff.

119.   At all times herein mentioned, ordinary consumers, including Plaintiff, who were implanted with FiberCel, could not and would not have recognized the potential defects, risks, and dangers of contaminated FiberCel units.

120.   At all times herein mentioned, the aforementioned FiberCel was implanted into Plaintiff in a manner which was reasonably foreseeable to Aziyo.

121.   At all relevant times, the subject FiberCel was defectively manufactured by Aziyo in that its design and formulation is more dangerous than what an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

122.   As a direct and proximate result of Plaintiff's use of the defective FiberCel units as manufactured, designed, sold, supplied, and distributed into the stream of commerce by Aziyo, Plaintiff contracted TB, which has caused Plaintiff to suffer harm, damages, and economic loss, and Plaintiff will continue to suffer such harm into the foreseeable future.

123.   By reason of the foregoing, Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

**SEVENTH CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**
**(Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)**

124.   Plaintiff incorporates paragraphs 1 through 123 as though the same were set forth at length herein.

125.   At all times material to this lawsuit, Aziyo was engaged in the business of designing, manufacturing, testing, marketing, distributing, and/or selling FiberCel

for the sale to, and use by, members of the public.

126. Aziyo manufactured, distributed, and/or sold the FiberCel product which was implanted into Plaintiff's body during her spinal surgery.

127. The FiberCel manufactured by Aziyo reached Plaintiff without substantial change in its condition when it was implanted into her spine during her operation.

128. The FiberCel was defective and unreasonably dangerous when it entered into the stream of commerce and when used by Plaintiff and was not materially altered or modified prior to its use.

129. The subject FiberCel is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design. The subject FiberCel is defective in design because it is can cause severe infections, including tuberculosis. It is more dangerous than other available medical products indicated for similar conditions and uses, and the utility of the product does not outweigh its risks.

130. Aziyo owes a duty to the general public, specifically to Plaintiff, to exercise reasonable care in the design, study, development, manufacture, promotion, sale, marketing, and distribution of FiberCel. Aziyo failed to exercise reasonable care in the design of FiberCel because, as designed, FiberCel was capable of causing

serious personal injuries such as those suffered by Plaintiff during the foreseeable use of FiberCel.

131.   The FiberCel implanted into Plaintiff was defective and, because of its defects, was unreasonably dangerous to persons who might reasonably be expected to require its use.  In addition, this product was dangerous to the extent beyond that which could reasonably be contemplated by Plaintiff.

132.   At or before the time FiberCel was released on the market and/or sold to Plaintiff and/or her physicians, Aziyo could have designed the product to make it less prone to causing infections such as tuberculosis, a technically feasible safer alternative design that would have prevented the harm Plaintiff suffered without substantially impairing the function of the product.

133.   Plaintiff was not able to discover, nor could she have discovered through the exercise of reasonable diligence, the defective nature of the subject product. Further, in no way could Plaintiff have known that Defendant had designed, developed, and manufactured FiberCel in a way as to make the risk of harm or injury outweigh any benefits.

134.   The FiberCel implanted into Plaintiff was defective at the time it was distributed by Aziyo or left its control.

135.   Plaintiff was a person who would reasonably be expected to use FiberCel.

136.   Aziyo's failure to exercise reasonable care in the design, marketing, selling, distributing, and manufacturing of FiberCel was a proximate cause of Plaintiff's injuries and damages.

137.   Aziyo had a duty to create a product that was not unreasonably dangerous for its normal, intended use and breached this duty

138.   As a direct and proximate result of the actions and inactions of Aziyo, as set forth above, Plaintiff was exposed to FiberCel, and suffered the injuries and damages set forth herein.

139.   By reason of the foregoing, Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

**EIGHTH CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY – FAILURE TO WARN**
**(Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)**

140.   Plaintiff incorporates paragraphs 1 through 139 as though the same were set forth at length herein.

141.   At all times herein mentioned, Aziyo designed, developed, researched, tested, and knew or should have known about significant risks with FiberCel, including the risk of transmitting serious infections such as tuberculosis.

142.   At all times herein mentioned, Aziyo advertised, promoted, marketed, sold, and distributed FiberCel that was implanted into Plaintiff.

143.   The FiberCel was expected to and did reach Plaintiff without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Aziyo.

144.   Aziyo had an independent duty and continuing duty to warn the medical community and Plaintiff's physicians about the significance of the risks of tuberculosis and other health harms with FiberCel.

145.   Plaintiff used the FiberCel in a manner intended and foreseeable by Aziyo.

146.   FiberCel was defective due to inadequate warnings because Aziyo knew or should have known that the product created a significantly increased risk of infections such as tuberculosis, and failed to warn the medical community and Plaintiff's physician of the nature of such risks.

147.   Aziyo owed a duty of reasonable care to adequately warn of the risks associated with the use of FiberCel to foreseeable users, including Plaintiff.

148.   Aziyo knew or reasonably should have known that the warnings provided to users of FiberCel regarding the risks associated with its use were incorrect or inadequate in at least the following material respects:

> a. FiberCel was unaccompanied by proper warnings regarding all possible risks associated with its use and the comparative severity, incidence, and duration of adverse effects; and

b. Aziyo  failed to include adequate warnings that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of FiberCel, including, among other things, development of TB;

c. Aziyo failed to immediately warn patients and physicians after they learned that their product was contaminated with TB; and

d. Otherwise failed to provide adequate warnings.

149.   By failing to warn Plaintiff and Plaintiff's physicians of the adverse health risks associated with FiberCel, Aziyo breached its duty to Plaintiff of reasonable care and safety.

150.   Aziyo, as a manufacturer and distributor of human tissue products, is held to the level of knowledge of an expert in the field; and further, Aziyo knew, or should have known, that the warnings they distributed were inadequate regarding the risks of a contaminated product causing TB and associated injuries and complications following the implantation of FiberCel.

151.   Plaintiff did not have the same expert knowledge as Aziyo, and no adequate warning of other clinically relevant information and data was communicated to Plaintiff or Plaintiff's physicians.

152.   Aziyo has a continued duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with FiberCel, as it came or could have become available.

153.   Although physicians are supposed to weigh the risks and benefits before prescribing a medical device, Aziyo knew that their deliberate omissions would cause physicians, including Plaintiff's physician, to use FiberCel without being able to adequately weigh the risk of developing serious infections like tuberculosis.

154.   If Aziyo would have properly warned about FiberCel's health harms, no reasonable physician, including Plaintiff's physician, would have recommended the use of FiberCel because the potential benefits are significantly outweighed by the risk of serious harm.

155.   Aziyo marketed, promoted, distributed, and sold an unreasonably dangerous and defective human tissue product, FiberCel, to health care providers empowered to implant FiberCel into consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data.  Through both omission and affirmative misstatements, Defendant mislead the medical community about the risk and benefit balance of FiberCel, which resulted in severe injury to Plaintiff.

156.   Aziyo knew or should have known that consumers, including Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Defendant's failures.

157.   Defendant Aziyo had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information, data, and warnings regarding the adverse health risks associated with the implantation of FiberCel.

158.   By failing to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with the implantation of FiberCel, Defendant breached its duty of reasonable care and safety.

159.   Defendant's actions described above were performed willfully, and with reckless disregard of the life and safety of the Plaintiff and the general public.

160.   Defendant's failure to provide adequate warnings was a proximate cause of Plaintiff's injuries and damages.

161.   As a direct and proximate result of the actions and inactions of Aziyo as set forth above, Plaintiff was exposed to contaminated FiberCel and suffered the injuries and damages set forth herein.

162.   By reason of the foregoing, Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

## <u>NINTH CAUSE OF ACTION</u>
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)

163.    Plaintiffs incorporate the foregoing paragraphs 1 through 162 as though the same were set forth at length herein.

164.    Aziyo is in the business of designing, manufacturing, supplying, selling, and placing into the stream of commerce certain goods, including FiberCel. By placing FiberCel into the stream of commerce, Aziyo impliedly warranted that it was merchantable.

165.    A warranty that the goods were merchantable was implied in all relevant contracts for the sale of the instant product, and furthermore, any Defendant sellers were merchants with respect to goods of that kind.

166.    Plaintiff was a foreseeable user of the FiberCel designed, manufactured, and placed into the stream of commerce by Aziyo.

167.    Aziyo breached its implied warranty of merchantability since the FiberCel product manufactured and/or sold and was placed into the stream of commerce by Aziyo and implanted into Plaintiff was contaminated, leading persons who received FiberCel implants to develop tuberculosis, including Plaintiff, and accordingly was not merchantable for its intended use, resulting in personal injuries suffered by Plaintiff, including her development of tuberculosis.

168.  The contamination in the FiberCel product, manufactured, supplied, and placed into the stream of commerce by Aziyo, was present at the time the FiberCel units left Aziyo's control and at the time it was implanted into Plaintiff as part of her spinal operation.

169.  Aziyo failed to comply with merchantability requirements, as the defective FiberCel product did not achieve the ordinary purposes they advertise: a safe option for a bone void filler to be used in various orthopedic and spinal procedures.

170.  Beyond Aziyo's own direct sales of the defective FiberCel product, Plaintiff and other consumers are third-party beneficiaries of Aziyo's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of the FiberCel product to consumers. Plaintiff and consumers are the intended beneficiaries of Aziyo's implied warranties since the FiberCel product is manufactured with the express and intended purpose of selling the products to consumers.

171.  As a direct and proximate result of Aziyo's breach of its implied warranties of merchantability regarding the contaminated FiberCel product, Plaintiff was damaged because, had she been aware of the unmerchantable condition of the FiberCel product, she may have not used, or agreed to use, the FiberCel product for her spinal surgery, and she may have not suffered injuries and damages from such

use, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

172.   By reason of the foregoing, Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

## TENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### (Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)

173.   Plaintiffs incorporate the foregoing paragraphs 1 through 172 as though the same were set forth at length herein.

174.   At all relevant times, Aziyo, through its advertising and promotional materials, expressly and impliedly warranted and affirmed that the FiberCel product's purpose was to offer a safe option for a bone void filler to be used in various orthopedic and spinal procedures.

175.   Defendant represented the defective FiberCel product as safe, despite knowingly having never adequately researched or tested the recovered human tissue to determine whether or not the subject FiberCel product was manufactured properly and was free from contamination or other defects, before placing the devices on the market and promoting them to consumers.

176.   Defendant intended to make Plaintiff and the general public believe the defective FiberCel product was safe.

177.    Aziyo knowingly mislead Plaintiff and the general public to believe the FiberCel products were safe for use, despite knowing that FiberCel could lead to serious injuries and cause severe harm, all of which Aziyo knew, or by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would be victim to.

178.    At all relevant times, Aziyo had knowledge of the health risks posed by the FiberCel product when used in surgery as intended.

179.    At all relevant times, Aziyo willfully failed to disclose the health risks associated with use of the FiberCel product to Plaintiff, and Plaintiff's physicians, and the consuming public.

180.    Plaintiff relied to her detriment on the information publicized by Aziyo.

181.    In reliance upon these implied warranties as to the safety of the subject device by Aziyo, Plaintiff and Plaintiff's surgeon used, and/or agreed to use the FiberCel product in her spinal surgery believing that the subject product was inherently safe.

182.    Plaintiff notified Defendants of the breach.

183.    As a direct and proximate result of Aziyo's breach of implied warranties concerning the defective FiberCel device, as described herein, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages,

consequential damages, interest, costs, and attorneys' fees.

184.   By reason of the foregoing, Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

**ELEVENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(Against Elutia Inc. f/k/a Aziyo Biologics, Inc.)**

185.   Plaintiffs incorporate the foregoing paragraphs 1 through 184 as though the same were set forth at length herein.

186.   At all times mentioned, Aziyo expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Aziyo and their authorized agents or sales representatives, orally and in publications, package inserts, and other written materials intended for physicians, medical patients, and the public, that FiberCel is safe, effective, fit, and proper for its intended use.   Plaintiff and Plaintiff's physicians utilized FiberCel relying upon these warranties.

187.   Aziyo's own promotional materials and information state that FiberCel is processed in sterile conditions and is screened for bacteria and communicable disease.

188.   In utilizing FiberCel, Plaintiff relied on the skill, judgment, representation, and foregoing express warranties of Aziyo.   These warranties and

40

representations were false in that FiberCel is unsafe and unfit for its intended uses.

189.   As a direct and proximate result of the actions and inactions of Aziyo as set forth above, Plaintiff was exposed to FiberCel, and suffered the injuries and damages set forth herein.

190.   By reason of the foregoing, Aziyo is liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

**TWELFTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(Against DCI Donor Services, Inc. and New Mexico Donor Services)**

191.   Plaintiffs incorporate the foregoing paragraphs 1 through 190 as though the same were set forth at length herein.

192.   At all times mentioned, Donor Services expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants Donor Services and their authorized agents or sales representatives, orally and in publications, package inserts, websites, and other written materials intended for physicians, medical patients, and the public, that their human tissue sold for use in FiberCel is safe, effective, fit, and proper for its intended use.  Plaintiff and Plaintiff's physicians utilized FiberCel and the human tissue used in FiberCel relying upon these warranties.

193.   In utilizing FiberCel and the human tissue used in FiberCel, Plaintiff

relied on the skill, judgment, representation, and foregoing express warranties of Defendants Donor Services.  These warranties and representations were false in that FiberCel and its human tissue component are unsafe and unfit for its intended uses.

194.   As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiff was exposed to FiberCel and the human tissue used in FiberCel, and suffered the injuries and damages set forth herein.

195.   By reason of the foregoing, Defendants are liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

## THIRTEENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against DCI Donor Services, Inc. and New Mexico Donor Services)

196.   Plaintiffs incorporate the foregoing paragraphs 1 through 195 as though the same were set forth at length herein.

197.   Donor Services is in the business of harvesting, recovering, selling, and placing into the stream of commerce certain goods and/or services, including the sale of human tissue.  By placing human tissue into the stream of commerce to be used in surgical procedures, including the Plaintiff's surgical procedure in April 2021, Donor Services impliedly warranted that it was safe and merchantable.

198.   A warranty that the goods and/or services were merchantable was implied in all relevant contracts for the sale of the instant product, and furthermore,

any Defendant sellers were merchants with respect to goods of that kind.

199. The tuberculosis-contaminated human tissue sold by Donor Services and placed into the stream of commerce by Donor Services, used in the recalled FiberCel, and implanted into Plaintiff was contaminated, leading persons who received FiberCel utilizing contaminated human tissue sold by Donor Services to develop tuberculosis, including Plaintiff, and accordingly, was not safe or merchantable for its intended use.

200. The contamination in the human tissue, harvested, recovered, supplied, sold, and placed into the stream of commerce by Donor Services was present at the time the human tissue left Defendants' control and at the time it was implanted into Plaintiff as part of her spinal operation.

201. Donor Services breached the implied warranty of merchantability for its human tissue because it was contaminated and unmerchantable resulting in personal injuries suffered by Plaintiff, including her development of TB.

202. Established medical and technological procedures existed at the time Donor Services harvested, recovered, supplied, and sold the tuberculosis-contaminated human tissue that could have been employed pursuant to the standards of local medical practice that would have detected the presence of an infection in the donor, including but not limited to, the detection of TB.

203.   Had established medical and technological procedures been employed, including but not limited to additional human tissue testing and/or a more rigorous screening protocol, Donor Services could have discovered that its tissue was contaminated with TB and could have prevented its human tissue from being disseminated for use in surgical procedures.

204.   Plaintiff was a foreseeable user and/or recipient of the human tissue harvested, recovered, supplied, sold, and placed into the stream of commerce by Defendants Donor Services.

205.   As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiff was exposed to FiberCel and the human tissue used in FiberCel, and suffered the injuries and damages set forth herein.

206.   By reason of the foregoing, Defendants are liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### (Against DCI Donor Services, Inc. and New Mexico Donor Services)

207.   Plaintiffs incorporate the foregoing paragraphs 1 through 206 as though the same were set forth at length herein.

208.   Defendants represented that their human tissue they sold for use in FiberCel was safe, despite knowingly having never adequately screened the donor

whose tissue they sold, to assess its safety before placing the human tissue on the market.

209.   Defendants intended to make Plaintiff and the general public believe the contaminated human tissue sold for use in FiberCel was safe.

210.   Defendants knowingly mislead Plaintiff and the general public to believe that their human tissue was safe for use, despite knowing that the use of their tissue could lead to serious injuries, all of which Defendants knew, or by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would be victim to.

211.   Established medical and technological procedures existed at the time Defendants Donor Services harvested, recovered, supplied, and sold the tuberculosis-contaminated human tissue that could have been employed pursuant to the standards of local medical practice that would have detected the presence of an infection in the donor, including but not limited to, the detection of TB or a different disqualifying infection.

212.   Had established medical and technological procedures been employed, including but not limited to additional human tissue testing and donor screening, Donor Services could have discovered that its tissue was contaminated with TB and could have prevented its human tissue from being disseminated for use in surgical procedures.

213.   At all relevant times, Defendants had knowledge of the health risks posed by inadequately screened donor tissue.

214.   At all relevant times, Defendants willfully failed to disclose the defects and health risks of its contaminated human tissue to Plaintiff, Plaintiff's medical providers, and the consuming public.

215.   Plaintiff relied to her detriment on the information publicized by Defendants.

216.   In reliance upon these implied warranties as to the safety of the harvested human tissue used in the subject FiberCel product by Defendants, Plaintiff agreed to use the FiberCel product, and Plaintiff's medical provider did use the FiberCel product in Plaintiff's spinal surgery, believing that the subject device was inherently safe.

217.   Plaintiff notified Defendants of the breach.

218.   As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiff was exposed to FiberCel and the human tissue used in FiberCel, and suffered the injuries and damages set forth herein.

219.   By reason of the foregoing, Defendants are liable to Plaintiff for all her injuries, harm, damages, and economic and non-economic losses in an amount to be determined in the future in excess of $75,000.

## FIFTEENTH CAUSE OF ACTION
### LOSS OF CONSORTIUM
### (Against All Defendants)

220.   Plaintiffs incorporate the foregoing paragraphs 1 through 219 as though the same were set forth at length herein.

221.   During the pertinent time, the negligence of the Defendants proximately caused Plaintiff Steven Langford to lose the consortium of his spouse, Plaintiff Tina Langford.

222.   Mr. and Mrs. Langford were legally married at the time of Plaintiff Tina Langford's above described injuries.

223.   During the pertinent times, Plaintiff Steven Langford's marital relationship with his spouse had beneficial aspects including but not limited to marital services, society, affection, and companionship.

224.   As a direct and proximate result of Defendants' negligence, for a significant period of time, Plaintiff Steven Langford has lost the consortium of his spouse.  There has been a disruption of marital services, society, and companionship.

225.   Defendants' negligence was a substantial factor in causing the loss of consortium.

226.   Accordingly, Defendants should be jointly and severally found liable to the Plaintiff Steven Langford in an amount of damages as may be found by a jury at trial herein.

47

## JURY DEMAND

Plaintiffs request a trial by jury of all claims herein so triable.

## PRAYER FOR RELIEF

WHEREFORE**,** Plaintiffs pray for relief against Defendants, jointly and severally, as follows:

a.     Compensatory damages, exclusive of interest and costs, and in an amount to fully compensate Plaintiffs for all past, present, and future pain, and suffering;

b.     Special damages, exclusive of interest and costs, and in an amount to fully compensate Plaintiff Tina Langford for all of her injuries and damages, both past and present;

c.     Punitive and/or exemplary damages for the outrageous, willful and wanton, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

d.     An award of damages for loss of consortium to fully compensate Steven Langford;

e.     To the extent the law may allow same, an award of expenses and costs of this action, as well as any attorney fees that may be applicable;

f.      Pre-judgment and post-judgment interest in the maximum amount allowed by law; and

g.      Such further relief as this Court deems necessary, just, and proper.

Respectfully submitted, this 29th day of August, 2024.

**SHIVER HAMILTON CAMPBELL, LLC**

*/s/ Kyle G.A. Wallace*
Alan J. Hamilton
Georgia Bar No. 320698
Kyle G.A. Wallace
Georgia Bar No. 734167
3490 Piedmont Road, Suite 640
Atlanta, Georgia 30305
Telephone: (404) 593-0020
Facsimile: (888) 501-9536
alan@shiverhamilton.com
kwallace@shiverhamilton.com

Lawrence R. Cohan, Esq.*
Joshua C. Cohan, Esq.*
Alison J. Russell, Esq.*
David C. Magagna Jr., Esq.*
**SALTY MONGELUZZI & BENDESKY P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Phone: 215.486.8282
Fax: 215.496.0999
Email:  lcohan@smbb.com
        jcohan@smbb.com
        arussell@smbb.com
        dmagagna@smbb.com

*On behalf of Plaintiffs*

*\*Pro Hac Vice Applications forthcoming*